**Liliana Rusansky Drob, Psy.D.**
**Clinical Psychologist**
**26 Court Street – Suite 1214**
**Brooklyn Heights, NY 11242**
lilidrob@gmail.com
**Cell Phone/Voice Mail: 646-262-7834**

**PSYCHOLOGICAL REPORT**

Name: Juanito Cordoba Bermudez
DOB: 02/03/67
Age:  43
Interview and Testing: 12/20/10, 12/22/10, 1/26/11
Report Date:  3/23/11

## Introduction

Mr. Cordoba Bermudez is a single 43-year-old single male, native of Colombia, who was referred by defense counsel, Mr. Francisco Celedonio, Esq. for a psychological evaluation in connection with his charge of conspiracy to distribute drugs and other materials to the FARC, a Colombian terrorist organization. This examiner discussed with the defendant her role as a psychologist and clarified the limitations of confidentiality should he and his lawyer decide to utilize the results of this evaluation as part of his legal defense or for the purposes of sentencing.

The defendant was told, and he understood, that the examination was being conducted at the request of his attorney, that a report would be issued to Mr. Celedonio, and that such report might be shared with the government, probation and the court. He further understood that the purpose of the current examination was of an evaluative rather than a therapeutic nature.

The following psychological tests were administered to Mr. Cordoba Bermudez:

The WASI (Wechsler Abbreviated Scale of Intelligence)
The TONI-4 (Test of Non-Verbal Language)
The Rorschach Test (Exner administration and scoring)
The Trauma Symptom Inventory (TSI)

In addition a thorough clinical interview and mental status exam was conducted over the three occasions that this examiner saw Mr. Bermudez.  All the examinations and testing were conducted in Spanish as the defendant does not speak English.

**Personal Background**

Mr. Cordoba Bermudez is a 43-year-old single Hispanic male, who was born in Condoto, Colombia, on February 3rd 1967.  When asked his age, he looked confused and hesitated for a few minutes.  I asked the defendant about his nickname Chechere and he stated that his family never calls him by the name Juanito but refers to him as Chechere.  Mr. Cordoba Bermudez was raised by his parents, Lourdes Bermudez (now age 65) and Maximiliano Cordoba (who died at age 74) until he was 4 years old when his father left his mother to live with another woman and the other children he had with her.  As a result of this, Ms. Bermudez and her children moved to his mother's native town, Coredo, where they established themselves.  Ms. Bermudez re-married Ignacio Herrera who Mr. Cordoba Bermudez regards as "practically [his] father." After his mother re-married, she had four children with Mr. Herrera, Henrry, Reynaldo, Pablo and Omar. Mr. Bermudez reports that Mr. Herrera died of a heart attack in 1998, at the age of 47, after the murder and disappearance of several relatives, including his son (and the defendant's half-brother) Omar Herrera.

It was observed that the defendant was limited in his capacity to recall names, dates, and locations and he was very anxious as he attempted to narrate the history of his family and the chronology of his life.   Although Mr. Cordoba Bermudez had difficulty recalling his siblings' names and occupations, he was able to provide a basic family history, which he based on a list he had brought with him to the examination, and which he explained was prepared for him by his mother.  He stated that he had 11 siblings but could only account for seven (some of whom are now deceased).  Presently, his brother Leandro lives in Buena Aventura, a town close to Cali, Colombia.  Mr. Cordoba Bermudez reports that his family is trying to help Leandro move to Panama due to the overwhelming danger in Cali, Colombia (as a result of drug lords and the fight against *narcotrafico*).

Luzmilla Cordoba, age 50, lives in La Palma, Panama with her husband and children. She is a housewife who is also occupied caring for their mother, Ms. Lourdes Bermudez. The defendant indicates that he has several siblings who are deceased.  Among them is Victor Julio Cordoba Bermudez, who was murdered in December, 2000 by the FARC (Fuerzas Armadas Revolucionarias de Colombia). Henrry Herrera Bermudez, a half-brother, was also shot and killed during the same incident. Omar Bermudez, died at age 15 as a result of a close range shooting by FARC forces on May 11th 1996.
Reynaldo Herrera Bermudez, a half-brother disappeared at around the same time and has not been seen since.  As a result he was declared officially dead retrospectively on 01/02/98.  Pablo Herrera Bermudez, the defendant's 30-year-old half-brother also disappeared and was officially declared dead on 12/12/2008. Maximiliano Cordoba (a paternal uncle) was found dead on a beach close to the family's home town in October 1994, and was believed to be killed in an attack by FARC forces.

Mr. Bermudez reports that the terrorist militant group called FARC—a Colombian revolutionary movement that consistently uses violence to seize control of certain rural areas since 1980—displaced him and his family. He explained that violence has been a daily occurrence in northern Colombian towns and the scene of a conflict between the

government and the guerrilla movements of the 1970's, 80's to the present. When asked about the goals of the FARC, Mr. Bermudez stated that he does not understand what the FARC wants. He states that they kill people and rob them of their belongings. He stated that they hold "meetings" but could not elaborate on their content.

Mr. Cordoba Bermudez relates that his family owned a farm with fruit trees, plantains, rice, corn, yucca, and other crops. Their land was about 3 hectares in size. He reports that the FARC arrived sometime in 1996 and a power struggle ensued between the villagers and the militants. The FARC started to displace people in order to occupy the town. Mr. Cordoba Bermudez reports that they used violence against the peasants, raping the women in the village, stealing land and goods from the people and forcing villagers to take sides.

Mr. Bermudez relates that his half-brother on his father's side, Maximiliano Bermudez disappeared after being kidnapped from his father's house. At that point (around 1994), the FARC was still hiding out in the mountains above the town. This was before the invasion of Condoto. Mr. Bermudez relates that another one of his (maternal) half-brothers, Reynaldo Herrera Bermudez, was kidnapped in January of 1998. Mr. Bermudez relates that another half brother, Pablo Herrera Bermudez, disappeared on December 12th, 2008. Mr. Bermudez relates that at one point the FARC announced they were going to kill his whole family. In fact, many of Mr. Bermudez's cousins who were situated in other towns were also killed by the FARC. The defendant reports that these cousins included Pastor Cordoba, Javier Badillo Bermudez, and Tomas Badillo Bermudez.

Mr. Bermudez related that upon the seizing of Condoto by the FARC the villagers in Condoto united and discussed their options. The village was composed of only 40 homes, with no police and limited access to other larger towns; therefore it became very easy for the FARC to gain control of the village. The FARC gave the villagers a short waiting period to make their decision: either they joined the FARC, or they left. Any person who tried to oppose them was murdered. Mr. Bermudez reports that his mother decided to stay with Mr. Herrera, her husband and the youngest child, Omar, age 15, while the rest of her children, including Mr. Bermudez, left. The defendant reports that his brother, Victor Julio, publicly denounced the FARC, saying he was going to join the Colombian army in order to fight back and reclaim their village. He believes that the FARC sought revenge against the town for reporting them to the government, and for not collaborating. In fact, Mr. Cordoba Bermudez states that the Colombian army had several fights against the FARC in that area at the time. The FARC especially sought revenge against the Bermudez family due to Victor Julio's outspoken threat.

Mr. Cordoba Bermudez reports that on May 11th, 1996, his uncle, Herminio Bermudez Mosquera (a maternal uncle) and Omar Herrera were murdered at gunpoint during a celebratory party the villagers had put together. Mr. Cordoba Bermudez relates that they were killed by the FARC to make an example of them—"to show us what could happen if we retaliated." Most of the villagers fled to Darien, Colombia. Mr. Bermudez reports that he left in 1996. Victor Julio had also tried to move to Darien (a town in the border

3

between Panama and Colombia) but was killed by shooting at close range the same day along with his half-brother Henrry Herrera Bermudez.  Mr. Cordoba Bermudez shows this interviewer two death certificates issued by the Panamanian authorities indicating the deaths of these two brothers on 12/16/2000; however, it is unclear if these deaths occurred on that date or the government issued a certificate with an approximate date of death.

The defendant relates that after his stepfather died, his mother moved to La Palma, Panama, where she currently resides with her daughter Luzmilla.  Mr. Bermudez reports that his mother has a small piece of land there where she raises chickens and a small crop.

**Early Environment**

Mr. Cordoba Bermudez reports that he had a very happy childhood, relating that he although they were poor they had no deprivations.  He reports that his parents separated because his father was seeing another woman and that he would become violent towards his wife after drinking. Mr. Bermudez reports that his father would not mistreat the children, but he wasn't a dedicated parent.  Mr. Bermudez reports that he and his siblings were very united and close and were very supportive of one another.

**Medical and Psychological History**

Mr. Bermudez reports that aside from his father's alcoholism, no one in his family suffered from any medical, psychological, or substance abuse problems.  Mr. Bermudez relates that he was never a victim of sexual or physical abuse.

Mr. Cordoba Bermudez reports that he currently suffers from headaches and stomachaches.  He states that he eats very small portions, as he cannot get used to the American diet served in jail.  He keeps isolated most of the time out of fear of trouble with other inmates.

**Educational History**

Mr. Cordoba Bermudez reports that he attended school up until the fourth grade. He relates that he attended San Roque School located in Jurado, Colombia, a town near his hometown, which survived the FARC takeover due to its larger size and organization. Mr. Bermudez reports that his village did not have many resources, and people who resided there had limited education and almost all worked as farmers. Mr. Bermudez reports that most of his family is uneducated, and that the majority attended school only up until the fifth grade.

**Social History**

Mr. Cordoba Bermudez reports that he has a daughter Arisa, now age 23, who he had with a woman he calls "Libia." He indicates that he had two children with Oliva Jimenez Rivas, who is now deceased. These children are John Cordoba (16-years old) who is in

4

high school and Juan Cortes Cordoba (15-years old), each of whom are currently cared for by Oliva's sister. Mr. Bermudez relates that he also has a 21 year old daughter, Yahiara, with a woman named Elena. Mother and daughter live in Darien, Colombia. Mr. Bermudez reports that he has another three children by Emiliana Jaimes. Mr. Bermudez relates that he lived with Emiliana prior to his arrest in Panama in 1999. Their children's names are Cesar Cordoba (b. 1995), Tatiana Cordoba (b. 1997) and Alejandro Cordoba (b. 1999). Mr. Bermudez relates that all three children are living with their mother in Panama City. Mr. Bermudez reports that he met another woman, Lenali Escobar, with whom he lived with and raised her two children John and Carlos. Mr. Bermudez reports that she lives close to Buenaventura, Colombia (near Cali).

**Employment History**

Mr. Bermudez relates that he has always worked as a farmer, tending to crops and farm animals. However, when he moved to Darien at age 28, he started working as a fisherman, usually fishing for shrimp.

**Substance Abuse**

Mr. Bermudez reports that he rarely used alcohol. He reports drinking beer on some occasions. Mr. Bermudez denies having ever used drugs.

**Prior Arrests**

Mr. Bermudez reports that in the late 1990s he was falsely accused in his wife's accidental death. Mr. Bermudez reports that this incident was very traumatic to him, especially after the deaths of so many of his relatives. He explains it as follows:

Mr. Bermudez lived with Oliva Jimenez Rivas for five years. He relates that Ms. Jimenez was jealous of a prior relationship Mr. Cordoba Bermudez had with another woman, Libia. According to the defendant, on the day of the incident Ms. Jimenez became increasingly suspicious and grabbed a pistol from her father (who was a police officer) in order to go out to find and kill Libia. Mr. Bermudez goes on to describe that Ms. Jimenez's father (Humberto Rivas) and himself struggled with her to retrieve the gun she had in her hands. In the process, the gun went off and a bullet struck Ms. Jimenez in her arm. Two hours later Ms. Jimenez had a heart attack and died. However, because of the accidental bullet wound in which he was involved, an investigation was carried out, and according to Mr. Cordoba Bermudez, he was cleared. However, he was ordered to stay at the disposition of the judge for further proceedings.

Mr. Cordoba Bermudez reports that when he moved to Darien, Panama, in 1999 Panamanian police arrested on charges of  "homicidio no culposo" (non-aggravated homicide) incident to a trial that had been conducted in his absence. Mr. Cordoba Bermudez reports that while Ms. Jimenez's family had earlier cleared him of any wrongdoing neither this family nor Mr. Cordoba himself had been informed of this trial. Mr. Cordoba Bermudez was a Panamanian citizen at that point. He relates that he was

5

sentenced to14 years in a Colombian prison, a sentence, which was later, reduced to 6 ½ years.  Mr. Cordoba Bermudez reports that he served the sentence in Bogota between 1999 and 2005. Mr. Cordoba Bermudez explains that the prison in Bogota had very unsanitary conditions.   Six people shared a cell, there was one bathroom per 150 people, and constant conflicts aroused among inmates commonly resulted in knife fights.  Mr. Cordoba Bermudez reports that while he was never harmed he often feared for his life.

Mr. Cordoba Bermudez reports that he was released from prison on March 9th, 2005, but remained in Bogota for three months to see his children and his brother Leandro. Mr. Cordoba Bermudez reports that he left from Bogota to Buenaventura where he caught a boat to Darien.

Mr. Cordoba Bermudez relates that he worked at the piers in Darien, Panama a town whose economy is based on fishing. Work was not consistent and there were times that Mr. Cordoba Bermudez did not earn any money.  He lived in a "pension" or boarding house alone.  At the boarding house Mr. Cordoba Bermudez met Mr. Calderon, who was staying in a room next to his.  Mr. Calderon told Mr. Bermudez that he was looking for people to work by bringing food and clothes shipments from Panama to Colombia. According to Mr. Cordoba Bermudez, most of the products (food, medicine, etc.) used in that area of Colombia come from Panama because of the proximity of the two countries, and further, they are transported via sea due to the poor road conditions and lack of railroads in that part of Colombia.  Mr. Calderon told Mr. Cordoba Bermudez that he needed to move boxes of food from Panama to Punta Ardita, Colombia by boat.  Mr. Cordoba Bermudez relates that he had no money and needed a job, and quickly agreed to Mr. Calderon's offer.  His first trip occurred in 2007. Mr. Bermudez relates that Mr. Calderon and himself loaded the cargo to bring it to Punta Ardita, but before they were to arrive, Mr. Calderon informed Mr. Cordoba Bermudez that they had to unload it on a different beach, further away from Punta Ardita.  Mr. Cordoba Bermudez reports that upon arrival, he saw several people coming down from the mountains towards the beach. At that point, Mr. Calderon told Mr. Cordoba Bermudez that the cargo was for the FARC forces.  Mr. Cordoba Bermudez reports that prior to this, he had no knowledge that he would be helping the FARC.  The defendant saw Mr. Calderon speak to a man named "Silver" who was the leader of the guerilla forces.  At that point Mr. Cordoba Bermudez remembered Silver from the 1996 FARC takeover of his town and his brothers' murders. "Silver" remembered Mr. Bermudez as well and told him to relax and that he had nothing to fear.  After this transaction, they all returned to Panama and Mr. Bermudez was paid four hundred dollars.  The defendant reports that the presence of "Silver" reminded him of his murdered family members.  After the first trip, Mr. Cordoba Bermudez wanted to tell Mr. Calderon that he did not want to continue to work for him but was afraid of being killed by the FARC.  He reports making five trips for a total payment of US $4500.  Mr. Cordoba Bermudez states that when a group of the FARC militants were arrested in February 2008 as a result of attacking Panamanian policemen, Silver contacted Mr. Cordoba Bermudez to ask him to obtain a lawyer for the captured militants.  Mr. Cordoba Bermudez states that he was very much frightened of Silver and told him he would look for a lawyer but could not find anyone and was relieved when Silver never called back.

Mr. Bermudez reports that the cargos transported consisted of food, medications and clothes. He denies knowing about a shipment of rifles or camouflage clothes for the guerrillas. Mr. Bermudez reports that he did this for money for his family and once he learned that the FARC was involved and that their boss Silver recognized him he was unable to say no.  Mr. Bermudez relates that the FARC's influence is felt all over Panama and as Mr. Calderon had explained to the defendant, he simply could not remove from himself from their employ.  Mr. Bermudez relates that the police in Darien were suspicious of Mr. Bermudez's actions and they began to keep surveillance on him. Mr. Bermudez reports that he told "Silver" he did not want any problems, and Mr. Bermudez stopped answering "Silver's" calls.  Mr. Cordoba Bermudez says that he was afraid of being found and killed by Silver or his cohorts.

On the day of his arrest, Mr. Cordoba Bermudez reports that the police arrived at his home with a search warrant to look for drugs.  The police accused him of smuggling cocaine. Although they found nothing, he was arrested and later taken by plane to the United States. Mr. Cordoba Bermudez states he was not aware he was going abroad.  He arrived at the Metropolitan Correction Center on May 6th, 2009.  Mr. Bermudez reports that he has already pled guilty to transporting food for money.  He denies membership to the FARC or being associated in any drug trade.  He indicates that his sentencing is scheduled for March 2011.

**Psychiatric History**

Mr. Bermudez denies any psychiatric history. However, he reports that while incarcerated in Bogota, he received a medication for insomnia called Sinogan (a phenothiazine antipsychotic/antianxiety agent) but he could not continue to take it due to agitation and extreme anxiety.  In addition, Mr. Cordoba Bermudez reports that received counseling with a psychologist while incarcerated in Bogota, Colombia for a few sessions.

When asked if he would like to see a psychiatrist now, he reports that he indeed has psychiatric symptoms (see below) but says that he is wary of being treated because he fears the effects of psychiatric medications.

**Competency Evaluation**

Mr. Cordoba Bermudez was ordered to undergo an examination of his competency by the Honorable Judge Denny Chin, United States District Court Judge.  Dr. Thomas Kucharsky and Dr. Normaris Gonzalez-Miller (a bilingual psychologist) examined Mr. Cordoba Bermudez on 7/15/09 for one and one-half hours.  It is reported that Mr. Cordoba Bermudez was cooperative with the examiners.  It is noteworthy that the examiners report that Mr. Cordoba Bermudez had told them that he had been incarcerated for the accidental homicide of a man, when he reported to me that his incarceration  was a result of the accidental death of his common-law-wife.

The examiners reported that the defendant was familiar with the legal process and was able to explain the concepts of guilty plea and oath.   Notably, the examiners found that

7

Mr. Cordoba Bermudez had a good relationship with his lawyer (Ms. Chauhthry) as "she is trying to help me. I trust my lawyer". He reported to me, however, that he did not trust his counsel and did not feel she was listening to his concerns, and that this led him to request that the judge assign him new counsel. It is possible that the Mr. Cordoba Bermudez's dissatisfaction with his lawyer began subsequent to the July, 2009 competency evaluation.

Dr. Kucharski and Dr. Gonzalez Miller concluded that Mr. Cordoba Bermudez has a fair understanding of the American legal system and that he presents with no severe psychiatric diagnosis that would prompt treatment or would render him incapable of participating in his legal process.

The examiners noted that the defendant had reported prior psychiatric treatment while he was incarcerated in Bogota , at which time he was depressed, and suffered from headaches as well as poor sleep and appetite following the assassination of one of his brothers. He also reportedly had a brief psychological treatment in Panama at age 37 after his release from prison. The defendant admitted to infrequent auditory hallucinations, but denied other current psychological symptoms. Records from MCC psychology services had not been reviewed at the time of the examination (nor have they been provided to the undersigned). Mr. Cordoba Bermudez was found competent to stand trial.

I evaluated Mr. Cordoba Bermudez for competency on 12/20/2010. He states that he is charged with conspiracy to support the FARC organization by transporting basic necessities for them. When asked to explain the role of a lawyer he states, "It's the defense, to help me". He described the prosecutor "as a person who asks questions and accuses you." The defendant says that the role of the judge is "to condemn you." Mr. Cordoba Bermudez states that he could not recall what a jury was. Witnesses are "the ones who talk about you to create problems, they accuse you." When asked if he knew what sentence he could receive if found guilty, he stated that his lawyer had not explained this to him.

Mr. Cordoba Bermudez reports that he had difficulties with the first lawyer appointed by the judge. He indicates that he changed lawyers because he believed that he and his first lawyer did not understand each other. He adds, "The lawyer I have now is better, he listens, he understands me…the other lawyer would yell at me. I sent a letter to the judge asking permission to change lawyers. My cellmate wrote the letter and the judge accepted to keep the other lawyer but has Mr. Celedonio (present lawyer) talk to me directly".

It is my professional opinion that in spite of an imperfect familiarity with the legal system, Mr. Cordoba Bermudez is competent to proceed with his case. However, he will continue to require education, repetition, and clarification on some legal terms and issues in order to raise his awareness regarding the sentencing options he is facing. Although he scored poorly on tests of intellectual functioning (se below), he is educable and motivated to learn.

**Current Mental Status**

Mr. Cordoba Bermudez is a Colombian man of medium build who came to the examination dressed in prison clothing. He did not wear glasses. He had no visible scars or tattoos. His posture was erect and he spoke somewhat slowly. His attitude towards this examiner appeared detached during the first interview but more engaged during subsequent examinations, during which he was fully cooperative. His attention and concentration were adequate. He assumed a comfortable posture and maintained good eye contact with the examiner.

Mr. Cordoba Bermudez was oriented to time, place and person. He had difficulty reporting the name of the facility he was in, but knew the name of the American and Colombian presidents.

Expressive and receptive language skills (in Spanish only) were adequate for normal conversation and his verbal spontaneity, productivity, grammar, enunciation, and comprehension of speech were all appropriate for his reported level of education which is at the third grade level. His memory appeared to be impaired and he was unable to spell a word backwards or to perform subtraction serial 7's. His performance on more simple numerical calculations was poor. Thinking was logical but when discussing certain themes related to his legal case he became somewhat circumstantial and vague.

The defendant's affect was appropriate to the content of his speech and his circumstances, and was observed to be generally anxious. He reported feeling frightened and indicated that to this day he experiences flashbacks of his brothers' murders (in particular that of his brother Victor).

The defendant reports that he is depressed, fearful, has difficulty sleeping and has recurrent dreams of his deceased brother, Victor, who he often senses at the foot of his bed. He indicates that while he was in jail in Bogota he heard the voices of the individuals who killed his brother. He further complains of forgetfulness and distractibility, and says that he has to write information down on paper or he will forget it. In addition, he describes a number of somatic or psycho-physiological symptoms, including headaches, stomach trouble, disturbances in sleep and appetite, fainting and numbness in parts of his body.

The defendant further reports that a week prior to our initial examination he heard a voice calling him by his last name but he found nobody was present when he turned in the voice's direction. He denies any current suicidal thoughts or plans. The defendant's insight is fair. He acknowledges that at times he has been impulsive and thoughtless bout his actions.

**Psychological Testing**

Mr. Cordoba Bermudez was administered the following psychological tests:

1. Wechsler Abbreviated Scale of Intelligence WASI)
2. Test of Non Verbal Intelligence (TONI 4)
3. The Rorschach Test (Exner administration and scoring)
4. Millon Multiaxial Clinical Inventory-III (MCMI-III)
5. The Trauma Symptom Inventory (TSI)

**Cognitive Functioning**

Mr. Cordoba Bermudez was administered the WASI (Wechsler Abbreviated Scale of Intelligence) which is used to obtain a general estimate of an individual's overall intellectual functioning. As the validity of the verbal subtests of the WASI, in particular the Vocabulary subtest are compromised when administered in Spanish translation, I will report scores only for the non-verbal scales of this test, and describe his verbal subtests performance in qualitative terms.

Mr. Cordoba Bermudez obtained a Performance (Non-verbal) IQ score of 72, which is in the lowest 3rd percentile in comparison to similarly aged peers in the normative sample, and is considered to be in the borderline range of intellectual functioning. On the Block Design subtest, which assesses visual-motor constructional abilities and non-verbal abstract conceptualization, Mr. Cordoba Bermudez obtained a T-score of 31, which is at the 4th percentile, which is also in the borderline range. He worked diligently but his slow performance compromised his score.

On the Matrix Reasoning subtest of the WASI, which assesses non-verbal abstract reasoning abilities and is considered to be a good measure of general intellectual potential, Mr. Cordoba Bermudez obtained a T-score of 32 also in the borderline level of intellectual functioning. On this subtest he appeared to respond very impulsively, in spite of the examiner's reminders to take his time. This approach resulted in his missing some easier items while accurately performing on somewhat more difficult ones.

Mr. Cordoba Bermudez's responses on the Similarities subtest of the WASI were qualitatively very poor. This subtest assesses verbal concept formation, abstract verbal reasoning ability and general thinking capacities. Although he was able to accurately state the similarity between a "shirt and jacket" and "TV-newspaper", he had difficulty with more abstract concepts. At those times he would describe how different two items were rather than stating what they have in common.

Mr. Cordoba Bermudez was also administered the test of Non-Verbal Intelligence-4 (TONI-4). This is a normed instrument that makes exclusive use of non-verbal abstract reasoning and figural problem solving to estimate general intellectual ability. This test is indicated for individuals who have intellectual impairments, or whose test performance

10

might be compromised by concurrent language and motor impairments. It is also useful when administered to individuals whose primary language is not English. The test does not contain pictures or cultural symbols that might compromise the scores of individuals who are not assimilated to the Western culture.

Mr. Cordoba Bermudez obtained a TONI Index score of 76, which is at the lowest 5th percentile. This score is indicative of poor (but not mentally deficient) intellectual functioning.  Based on these results, it is expected that the defendant will have difficulty with spatially oriented material, mastering abstract properties of visual symbols and generally managing information.

As will be noted below, Mr. Cordoba Bermudez experiences significant symptoms of depression and anxiety, which could have negatively impacted upon his concentration and thereby on his test scores. Thus, it is possible that the obtained test scores provide a somewhat low estimate of the defendant's intellectual potential. However, overall, the results of cognitive assessment are suggestive of intellectual functioning in the borderline range (IQ score 70-85).

On informal assessment the defendant is able to read and write simple Spanish commensurate with his third grade education.

**Personality and Emotional Functioning**

The Millon Clinical Multiaxial Inventory-III (MCMI-3), the Rorschach Inkblot Method and the Trauma Symptom Inventory (TSI) were administered in order to further evaluate Mr. Cordoba Bermudez's personality, emotional and social functioning.

The <u>Millon Clinical Multiaxial Inventory III (MCMI-III)</u> is a self-report inventory, which is useful in providing information regarding personality disorders and symptomatic disturbance in individuals who are being evaluated for psychological problems and/or treatment.  Mr. Cordoba Bermudez's approach to the MCMI-III suggests a tendency to complain and raises the possibility of some symptom exaggeration.  However, his item endorsements and scale elevations are consistent both with his reported history and clinical presentation, and are, moreover, consistent with the results of the Rorschach (see below) which does not rely upon self-report. Overall, his MCMI-III profile is indicative of a psychologically vulnerable individual who is undergoing an episode of acute turmoil, one that has undoubtedly been exacerbated by his arrest and incarceration. .

On the MCMI-III, Mr. Cordoba Bermudez obtained significantly elevated scores on scales that assess depression, anxiety, and post-traumatic stress.  There are indications that he suffers from a clinically severe depressive disorder. Timid and apprehensive his depression is characterized by social fears, worry over rejection and humiliation, self-doubts and preoccupation with death. He endorses items which suggest that he is deeply depressed, empty and hollow and feels worthless to others, yet his overall profile indicates that he has become somewhat resigned in the face of the symptoms.  His fear of expressing g his discontent leads him to turn his anger inward and results in his being

11

intropunitively depressed. The same dynamic appears to contribute to physical symptoms that are at least in part psychosomatic in nature. He indicated that he is physically weak and tired, has sleep difficulties, problems keeping his balance, and at times loses feeling and sensation in parts of his body. There are indications of prominent anxiety symptoms, characterized by nervousness, social anxiety, worry, self-doubt and a sense of masculine inadequacy. His anxiety also appears to negatively impact upon his capacity for concentration.

<u>The Trauma Symptom Inventory (TSI)</u> is a 100-item self-report inventory useful in evaluating symptoms of Posttraumatic Stress Disorder (PTSD), Acute Stress Disorder (ASD) and other psychological sequelae of traumatic events. It has three validity scales that are useful to detect overendorsement of symptoms, bizarre and inconsistent responses and random responding.

Mr. Cordoba Bermudez produced a valid TSI profile, with two scales elevated in the clinical range. AA (Anxious Arousal) Scale (T-score = 73), which measures symptoms of anxiety, hyperarousal, jumpiness and tension; and the D (Depression) Scale (T-score= 69), which assesses sadness and depressive symptoms such as hopelessness and worry. Mr. Cordoba Bermudez endorsed critical items involving suicidality (item30), hearing voices (item 65) and feelings of worthlessness (item 90). Scales assessing intrusive ideation, defensive avoidance and dissociation approached clinical significance. The elevations on the TSI are consistent with the findings on the MCMI-III and Rorschach (see below).

The defendant endorsed several atypical and critical items on the TSI, including a history of "fainting", "feeling paralyzed at times", "feelings of numbness in his body", and "not eating or sleeping for two days." Follow-up on these items indicates that the defendant has had chronic sleep difficulties, fainting episodes while in prison in Colombia, and that he often feels numb in his arms. Individuals who experienced repeated trauma have a similar profile to this defendant.

The Rorschach Inkblot Method (Comprehensive Administration and Scoring), provides information regarding thinking, perceptual processes and personality characteristics and is also used as a projective test in order to assess the individual's underlying fantasies, self-concept, and interpersonal perception.

Mr. Cordoba Bermudez produced a valid Rorschach protocol that is positive for the Coping Deficit Index and the Depression Index. These results are consistent with those on the MCMI-III and lend validity to his self-reported symptoms on that instrument and on interview. The Rorschach suggests that the defendant lacks sufficient coping resources with which to manage the demands imposed by his life circumstances. These deficits are likely to manifest in a wide range of life circumstances, but especially in his social interactions.

There are indications that Mr. Cordoba Bermudez tries to keep intense emotions under control, and this "bottled-up" affect impacts negatively on his capacity to think clearly

and impairs his concentration, judgment and decision-making. Test data further suggests that the defendant is susceptible to impulsivity that further contributes to his failure to exercise good judgment. Because of his inability to adequately cope with stress, he is at risk for episodes of depression, irritability and overt anxiety. Currently, he is experiencing even more stress than is typical for him, and this has further impaired his judgment, emotional stability and impulse control.

Also consistent with the results of the MCMI-III, the Rorschach suggests that Mr. Cordoba Bermudez displays excessive dependency behaviors, harbors naïve expectations in his relationships with others, is prone to rely on others for direction and support, and is likely to experience repeated disappointment when his expectations and dependency needs are not met. In reaction to such disappointment, and out of fear of further hurt and rejection he becomes socially isolated and emotionally withdrawn.

There are indications that Mr. Cordoba Bermudez lacks self-awareness and that he lacks an adequate understanding of the impact of his behavior on other people. This problem is compounded by a failure to adequately process information from his environment, to make judgments on the basis of limited data, and to exhibit serious deficits in reality testing.

Indeed a major finding is that Mr. Cordoba Bermudez has a severe impairment in his reality testing, that he misperceives events and forms mistaken impressions of people and interprets their actions in a very idiosyncratic manner. Thus, he frequently fails to anticipate the consequences of his actions and is prone to poor decision-making, faulty judgment and inappropriate behavior—to a degree that makes it difficult for him to maintain adequate psychological judgment for any length of time. These results suggest that he has difficulty maintaining adequate life adjustment without considerable input and direction from others. Without such direction and support he is subject to further psychological deterioration.

The Rorschach suggests that Mr. Cordoba Bermudez suffers from low self-esteem and sees himself as less attractive and less worthwhile than others. These data are consistent with those on the MCMI-III that indicate the defendant sees himself as inadequate and ineffective. Several of his responses on this test suggest he perceives himself as a broken man whose wounds remain open as his self-defeating behaviors lead him into continued difficulties. His poor self-appraisal contributes to bouts of depression and feelings of hopelessness.

The Rorschach suggests that while Mr. Cordoba Bermudez is interested in and capable of having intimate relations, and may make a good initial impression, he has a limited capacity to sustain meaningful long-term relationships possibly out of fear that others will make more demands upon him than he can handle. This fear contributes to his social ineptness, which in turn may lead to rejection and indifference from others. It is of note that he attempts to exert stringent control over his feelings and can present with a calm demeanor, albeit one that disguises his feelings of depression, anxiety and resentment.

Finally, the Rorschach is consistent with the findings that Mr. Cordoba Bermudez's attentional and cognitive capacities are limited. He has a very simplistic way of looking at the world as little energy is put forth to understand the complexity of events and relationships. One consequence of this limitation is rigidity in his thinking and a failure to grasp the range of options open to him in a given problematic situation.

**Conclusions and Opinion**

Mr. Cordoba Bermudez reports a history of severe family trauma in which several of his siblings and several cousins w\were killed by the FARC, an insurgent/guerilla organization based in Colombia, who are known to have threatened and killed indigenous people who resist their insurgencies and forcible recruitments.  The defendant shows the examiner death copiers of death certificates issued by the Panamanian government in 2000 for two of his brothers, but apart from this I have no independent confirmation of the deaths and traumas he reports. However, Mr. Cordoba Bermudez's psychological profile is consistent with a history of severe and chronic trauma. As noted above, the defendant relates his family deaths by referring to a list supplied by his mother, a prop that is understanable given his impaired cognitive functioning, attention and memory, and his generally limited fund of information. Mr. Cordoba Bermudez reports that he was particularly troubled by the assassination of his brother Victor, who spoke out against the FARC and paid for this with his life. He reports that he has had recurring dreams of this brother, has heard voices which he attributes to his brother's assassins, and that he has had the experience of seeing his brother at night at the foot of his bed.

Mr. Cordoba Bermudez reports a history of limited (3rd grade) education, employment as a farmer and a fisherman, and after his release from prison in Colombia in 2005, and great difficulty finding work. He has had a series of relationships resulting in multiple children with several women, but has never established himself in a consistent life niche or permanent family situation. He spent six years in prison in Bogota on charges in connection with the death of Oliva Jimenez Rivas, with whom he reports he resided for five years. As noted in some detail above, Mr. Cordoba Bermudez reports that Ms. Rivas died of a heart attack after an accidental shooting incident to his and his father's efforts to wrest a gun from her hands, and it was his understanding that her family had cleared him of all wrongdoing.  However, he was later tried "in-absentia" in Colombia, arrested in Panama and sentenced to 14 years in a Colombian prison, a sentence that he reports was later reduced to six and one-half years. Mr. Cordoba Bermudez describes his years in the Colombian prison as particularly traumatic and he says that while there he lived in extremely overcrowded and unsanitary conditions and often feared for his life.

Mr. Cordoba Bermudez reports that he was recruited to engage in the conduct leading to his current arrest while he was residing in Darien, Panama, close to the Colombian border.  He indicates that he was initially told that he would be loading cargoes of food to be transported to Colombia by boat, but he later learned that the cargo was for forces of the FARC. Subsequently he encountered a man by the name of "Silver," who he recognized has having been involved in his brothers' murders. Silver also recognized the defendant but told him that he had nothing to fear.  However, the encounter with Silver

14

and the traumatic memories it re-elicited produced fear in Mr. Cordoba Bermudez and, he says, made it impossible for him to simply walk away from the situation, something, given his history with the FARC, he very much wanted to do. Indeed, he was told by Calderon, who had recruited him into this work, that he could not extricate himself from Silver's employ. The defendant acknowledges unsuccessfully looking for a lawyer for captured militants at Silver's request and direction, and says that eventually he stopped answering Silvers' calls but continued to fear that he would be found and killed by Silver and/or his cohorts. Mr. Cordoba Bermudez denies that he was ever aware that he was involved in the shipment of arms.

The results of psychological assessment reveal a broad range of cognitive, emotional, and other psychological deficits and symptoms. Mr. Cordoba Bermudez's intelligence is quite limited, and his cognitive limitations are compounded by problems in the way he processes information from his environment and his severe deficits in reality testing. The latter creates a chronic impairment in his capacity to make accurate perceptions and judgment regarding his environment and the adaptability of his own behaviors.

The defendant's capacity to cope with the stresses of daily life is very limited, and testing indicates that he is incapable of achieving adequate adjustment without the support and direction of others. While he is fearful of others' scorn and rejection, he is highly dependent upon them, and readily subject to their entreaties, demands and manipulations. He views himself as weak and ineffectual and tends to follow the lead provided to him by those around him.

As noted above, Mr. Cordoba Bermudez exhibits symptoms of several psychological disorders, including chronic Posttraumatic Stress Disorder, a Depressive Disorder and a mixed personality disorder with depressive, dependent, and avoidant features. While the defendant exhibits problems in reality testing and reports a history of some auditory and possible visual hallucinations, there is no evidence that he suffers from a Schizophrenic spectrum or other major psychotic disorder. His more dramatic symptoms appear to be the consequence of trauma and anxiety. His main difficulties are in the areas of anxiety, depression, low self-esteem, and somatic symptoms, which have included headaches, stomach trouble, disturbances in sleep and appetite, fainting and numbness in parts of his body. Such psychophysiological symptoms are often seen in individuals who have anxiety reactions to severe trauma.

Mr. Cordoba Bermudez is a limited, traumatized and psychologically impaired individual who appears to have stumbled through life and found himself in a series of problematic situations, the latest of which involves his arrest and charges. His description of his life events and the results of psychological testing suggest that his life course, including his offense conduct, has been conditioned by his psychological limitations, dependencies and vulnerabilities, and the poor impulse control and defective judgment that these have entailed.

The losses described by the defendant appear to have contributed significantly to his anxiety, depression, vulnerability to decompensation, self-defeating behavioral cycles,

15

poor coping skills, and problems with impulse control, but apart from his reported trauma and losses, there are indications on psychological testing that he has been chronically impaired by these deficits and symptoms. Further, the picture obtained on psychological examination and testing is *consistent* with a history of chronic trauma, distress and interpersonal deficits and prolonged grief over the several deaths of brothers, cousins and other family members. In cases involving this kind trauma, with repetitive loss and the possibility of threat to one's life, classical PTSD symptoms, anxiety, depression and disorders of attachment, interpersonal relations, emotional dysregulation and chronic avoidance that impact negatively upon adult interpersonal functioning are frequently present.

Mr. Cordoba Bermudez's mood and general concerns may improve if a psychiatrist treats him, and he should be evaluated for possible antidepressant or *mood stabilizing* medication, and even antipsychotic medication, as he may indeed experience brief psychotic-like episodes, along with intrusive thoughts and dysphoric affect.  However, the chronic nature and depth of Mr. Cordoba Bermudez's psychopathology will require not only continued psychopharmacological intervention but also psychotherapy and occupational therapy in order to not only stabilize him but significantly improve his chances for adequate adjustment in the community.  Cognitive re-framing and exploratory psychotherapy might be used in addressing the defendant's dysfunctional interpersonal relationships with particular emphasis in his dependent behaviors. He should also be encouraged to become involved in more positive and rewarding activities that will enhance his self-worth.  An important part of the work is to change his beliefs that he must appease others by pleasing them and that he is "defective" or incapable of controlling his own destiny.

The defendant functions at the borderline range of intellectual capacity and therefore the language and plan for his criminal case, psychotherapy and vocational treatments should be tailored to his level of understanding.

It is this examiner's opinion that the defendant's psychological disorders have chronically impaired his capacity to accurately perceive his environment, others and their intentions, negatively impacted upon his judgment and made him vulnerable to the manipulation of others.  For the reasons described above, his psychological profile of limited intellectual functioning, chronic fear, anxiety and depression, poor coping capacities, impaired reality testing and passive dependency suggests that psychological factors contributed significantly to the commission of his offense conduct.

Diagnostically the defendant suffers from

AXIS I:  Features of Posttraumatic Stress Disorder (chronic)
         Depressive Disorder NOS
         R/O Somatization Disorder
AXIS II: Personality Disorder with Avoidant, Dependent, Depressive and Schizoid
         Features
AXIS III: none current

AXIS IV: Legal problems, prolonged grief, lack of education, land displacement, incarceration

AXIS V: 35

If any additional information pertaining to the defendant's personal or psychological history should become available please forward this to my attention.


Liliana Rusansky Drob, Psy.D.
Clinical Psychologist
N.Y. State License 15764